1  **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
   John T. Jasnoch (CA 281605)
2  600 W. Broadway, Suite 3300
   San Diego, CA 92101
3  Telephone: (619) 233-4565
   Facsimile: (619) 233-0508
4  jjasnoch@scott-scott.com

5  *Counsel for Plaintiff Charles Robinson*

6  [Additional counsel on signature page.]

7
                    **UNITED STATES DISTRICT COURT**
8                   **NORTHERN DISTRICT OF CALIFORNIA**

9  CHARLES ROBINSON, Individually and on          Case No. 3:19-cv-03045
   Behalf of All Others Similarly Situated,
10
                              Plaintiff,          **CLASS ACTION COMPLAINT FOR**
11                                                **VIOLATIONS OF THE SECURITIES**
             vs.                                  **ACT OF 1933**
12
   EVENTBRITE, INC., JULIA HARTZ, RANDY
13 BEFUMO, KATHERINE AUGUST-deWILDE,              JURY TRIAL DEMANDED
   ROELOF BOTHA, ANDREW DRESKIN, KEVIN
14 HARTZ, SEAN P. MORIARTY, LORRIE M.
   NORRINGTON, HELEN RILEY, STEFFAN C.
15 TOMLINSON, GOLDMAN SACHS & CO. LLC,
   J.P. MORGAN SECURITIES LLC, ALLEN &
16 COMPANY LLC, RBC CAPITAL MARKETS,
   LLC, SUNTRUST ROBINSON HUMPHREY,
17 INC., and STIFEL, NICOLAUS & COMPANY,
   INCORPORATED,
18
                              Defendants.
19

20

21

22

23

24

25

26

27

28

## CLASS ACTION COMPLAINT

Plaintiff Charles Robinson ("Robinson" or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge, as to Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, analyst and media reports, and other commentary and analysis. Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, Defendants (defined below). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this action under §§11 and 15 of the Securities Act of 1933 (the "Securities Act") against: (1) Eventbrite, Inc. ("Eventbrite" or the "Company"); (2) certain of the Company's senior executives and directors who signed the registration statement, dated September 18, 2018, filed with the SEC on Form S-1/A (the "Registration Statement") in connection with the Company's initial public offering (the "Offering"); and (3) each of the investment banks that acted as underwriters for the Offering (collectively, "Defendants"). Plaintiff alleges that the Registration Statement and Prospectus incorporated therein (collectively, the "Offering Documents") contained materially incorrect or misleading statements and/or omitted material information that was required by law to be disclosed. Defendants are each strictly liable for such misstatements and omissions therefrom (subject only, in the case of the Individual and Underwriter Defendants (both defined below), to their ability to establish a "due diligence" affirmative defense), and are so liable in their capacities as signers of the Registration Statement and/or as an issuer, statutory seller, offeror, and/or underwriter of the shares sold pursuant to the Offering. For all of the claims stated herein, ***Plaintiff expressly disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.***

2.      Eventbrite was founded in 2006, incorporated in March 2008, and is headquartered in San Francisco, California.

3.      Eventbrite operates a ticketing and event technology platform.  According to the Company, its platform "integrates components needed to seamlessly plan, promote and produce live events, thereby allowing event creators to reduce friction and costs, increase reach and drive ticket sales."

4.      On or around September 1, 2017, Eventbrite completed its acquisition of Ticketfly, LLC ("Ticketfly") from Pandora Media, Inc. for $201.1 million. The acquisition was meant to enhance Eventbrite's reach within the middle market of music industry ticket sales.

5.      On or around September 20, 2018, Eventbrite conducted the Offering in which $264.5 million worth of shares were offered to the public, consisting of 11,500,00 shares, including 1,500,000 shares sold pursuant to the exercise by the underwriters' option to purchase additional shares, that were offered at a price of $23.00 per share.  Eventbrite received aggregate net proceeds of $246.0 million.  A portion of the net proceeds were intended to repay the Company's outstanding indebtedness under its term loan facilities (which included $30.0 million of indebtedness incurred to finance the acquisition of Ticketfly).

6.      However, in violation of federal securities laws, and unbeknownst to investors, representations in the Offering Documents were materially inaccurate, misleading, and/or incomplete because they failed to disclose that the migration of creators from Ticketfly to Eventbrite was progressing more slowly than stated, forcing the Ticketfly integration to take longer than expected and that, as a result, the Company would face headwinds in revenue and growth.  Accordingly, the price of the Company's shares was artificially and materially inflated at the time of the Offering.

7.      Unfortunately for investors, who purchased the Company's shares pursuant or traceable to the Offering, the truth concerning the nature and extent of the problems facing the Company did not begin to emerge until after the Offering.

8.      On March 7, 2019, the Company announced a fourth quarter loss of $0.17 per share, which was well below analysts' estimates of a loss of $0.13 per share, and issued guidance for the first quarter of 2019 in a range between $80 million and $84 million, well below estimates of $91.3 million, due, in large part, to slower than anticipated migration of Ticketfly creators.

9.      On this news, Eventbrite's stock fell over 24% to close at $24.46 per share.

10.    On May 1, 2019, the Company announced a first quarter loss of $0.13 per share, which was well below analysts' estimates of a loss of $0.08 per share, and revenue of $81.3 million, below analysts' consensus of $83.1 million.  The Company issued guidance for the second quarter of 2019 in a range between $74 million and $78 million, well below estimates of $82.4 million, again due, in large part, to slower than anticipated migration of Ticketfly creators.   The Company also announced that Defendant Randy Befumo ("Befumo"), its Chief Financial Officer ("CFO"), would move into the role of Chief Strategy Officer.

11.    On this news, Eventbrite's stock declined over 27% to close at $17.60 per share.

12.    On May 30, 2019, the Company's stock closed at $15.83, or over 31% below the Offering price of $23.00 per share.

13.    By this action, Plaintiff, on behalf of himself and the other Class (defined below) members, who also acquired the Company's shares pursuant or traceable to the Offering, now seeks to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

14.    The claims asserted herein are purely strict liability and negligence claims.   Plaintiff expressly eschews any allegation sounding in fraud.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).  This Court has jurisdiction over the subject matter of this action pursuant to §22 of the Securities Act, 15 U.S.C. §77v.

16.    Venue is also proper in this District under §22(a) of the Securities Act, which provides that any suit under the Act may be brought "in the district wherein the defendant is found or is an inhabitant or transacts business[.]"  15 U.S.C. §77v(a).  Many of the violations of law complained of herein occurred in this District, including the dissemination of the materially false and misleading statements complained of herein.  In addition, Eventbrite's principal executive offices are located in this District.  Each of the other Defendants also has sufficient contacts with this District, or otherwise purposefully availed themselves of benefits of this District, so as to render the exercise of jurisdiction over each by this District consistent with traditional notions of fair play and substantial justice.

# PARTIES

### A.    Plaintiff

17.    Plaintiff Robinson purchased shares of the Company's common stock that were issued pursuant and traceable to the Offering Documents and the Offering and was damaged thereby.

### B.    Defendants

18.    Defendant Eventbrite is a Delaware corporation with its principal executive office in San Francisco, California.  Its shares are listed and trade on the New York Stock Exchange under the ticker symbol "EB."

19.    Defendant Julia Hartz ("Hartz") was, at all relevant times, the Chief Executive Officer and a director of the Company and signed, or authorized the signing of, the Registration Statement.

20.    Defendant Befumo was, at all relevant times, the CFO of the Company and signed, or authorized the signing of, the Registration Statement.

21.    Defendant Katherine August-deWilde ("August-deWilde") was, at all relevant times, a director of the Company and signed, or authorized the signing of, the Registration Statement.

22.    Defendant Roelof Botha ("Botha") was, at all relevant times, a director of the Company and signed, or authorized the signing of, the Registration Statement.

23.    Defendant Andrew Dreskin ("Dreskin") was, at all relevant times, a director of the Company and signed, or authorized the signing of, the Registration Statement.

24.    Defendant Kevin Hartz ("Kevin Hartz") was, at all relevant times, a director of the Company and signed, or authorized the signing of, the Registration Statement.

25.    Defendant Sean P. Moriarty ("Moriarty") was, at all relevant times, a director of the Company and signed, or authorized the signing of, the Registration Statement.

26.    Defendant Lorrie M. Norrington ("Norrington") was, at all relevant times, a director of the Company and signed, or authorized the signing of, the Registration Statement.

27.    Defendant Helen Riley ("Riley") was, at all relevant times, a director of the Company and signed, or authorized the signing of, the Registration Statement.

28.    Defendant Steffan C. Tomlinson ("Tomlinson") was, at all relevant times, a director of the Company and signed, or authorized the signing of, the Registration Statement.

29. Defendants Hartz, Befumo, August-deWilde, Botha, Dreskin, Kevin Hartz, Moriarty, Norrington, Riley, and Tomlinson are collectively referred to herein as the "Individual Defendants."

30. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter for the Offering. In the Offering, Goldman Sachs agreed to purchase 3,400,000 shares of Eventbrite common stock, exclusive of its option to purchase additional shares.

31. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Offering. In the Offering, J.P. Morgan agreed to purchase 2,900,000 shares of Eventbrite common stock, exclusive of its option to purchase additional shares.

32. Defendant Allen & Company LLC ("Allen") served as an underwriter for the Offering. In the Offering, Allen agreed to purchase 1,850,000 shares of Eventbrite common stock, exclusive of its option to purchase additional shares.

33. Defendant RBC Capital Markets, LLC ("RBC Capital") served as an underwriter for the Offering. In the Offering, RBC Capital agreed to purchase 1,000,000 shares of Eventbrite common stock, exclusive of its option to purchase additional shares.

34. Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") served as an underwriter for the Offering. In the Offering, SunTrust agreed to purchase 600,000 shares of Eventbrite common stock, exclusive of its option to purchase additional shares.

35. Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter for the Offering. In the Offering, Stifel agreed to purchase 250,000 shares of Eventbrite common stock, exclusive of its option to purchase additional shares.

36. Defendants Goldman Sachs, J.P. Morgan, Allen, RBC Capital, SunTrust, and Stifel are collectively referred to hereinafter as the "Underwriter Defendants." The Underwriter Defendants received lucrative fees and commissions, totaling in excess of $18.5 million, for their role in the Offering.

37. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering's Registration Statement and Prospectus. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

38.     The Underwriter Defendants are primarily investment banking houses that specialize, among other things, in underwriting public offerings of securities.  As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

39.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

40.     Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the Offering.  They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

41.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans and the material misstatements and omissions contained in the Registration Statement, as detailed herein.

42.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's shares pursuant and/or traceable to the Offering and relevant Offering Documents, including to Plaintiff and the Class.

**SUBSTANTIVE ALLEGATIONS**

**I.    THE OFFERING AND THE COMPANY'S MATERIALLY FALSE, MISLEADING, AND INCOMPLETE REGISTRATION STATEMENT AND PROSPECTUS**

43.    As background, on or around September 1, 2017, Eventbrite completed its acquisition of Ticketfly from Pandora Media, Inc. for $201.1 million.  The acquisition was meant to expand Eventbrite's solutions for music-related events.

44.    On or around September 20, 2018, Eventbrite conducted the Offering in which $264.5 million worth of shares were offered to the public, consisting of 11,500,00 shares, including 1,500,000 shares sold pursuant to the exercise by the underwriters' option to purchase additional shares, that were offered at a price of $23.00 per share.  Eventbrite received aggregate net proceeds of $246.0 million.  A portion of the net proceeds were intended to repay the Company's outstanding indebtedness under its term loan facilities (which included $30.0 million of indebtedness incurred to finance the acquisition of Ticketfly).

45.    The Registration Statement and Prospectus used to effectuate the Offering were false and misleading in that they misled investors with respect to the pace of integration of Ticketfly after its acquisition by Eventbrite.  This information was highly material to investors because a major part of the Company's growth strategy was to "*Selectively Acquire Businesses Focused on Serving Creators*[,]" according to the Offering Documents.

46.    Given the Individual Defendants' interest is ensuring a favorably high offering price, it is hardly surprising that the Offering Documents presented a highly positive picture of the Company's business, performance, prospects, and products, while omitting crucial realities.

47.    The Offering Documents made the following representations concerning Eventbrite's business and the Ticketfly acquisition, integration, and migration of creators:

> *Our results vary from quarter-to-quarter and year-to-year. Our results of operations in certain financial quarters or years may not be indicative of, or comparable to, our results of operations in subsequent financial quarters or years.*
>
> Our quarterly results of operations have fluctuated significantly in the past due to these factors and a variety of other factors, many of which are outside of our control and difficult to predict. It is difficult for us to forecast the level or source of our revenue accurately. Because our results may vary significantly from quarter-to-quarter and year-to-year, our financial results for one quarter or year cannot necessarily be compared to another quarter or year and may not be indicative of our future financial performance in subsequent

quarters or years. Period-to-period comparisons of our results of operations may not be meaningful, and you should not rely upon them as an indication of future performance. In addition to other risk factors listed in this "Risk Factors" section, factors that may cause our results of operations to fluctuate include:

- creator acquisition and retention;

- new solution introductions and expansions, or challenges with introduction;

- acquisition of companies and the success, or lack thereof, of migration of such companies' creators;

- changes in pricing or packages;

- the development and introduction of new products or services by us or our competitors;

- increases in operating expenses that we may incur to grow and expand our operations and to remain competitive;

- system failures or breaches of security or privacy;

- changes in stock-based compensation expenses;

- adverse litigation judgments, settlements or other litigation-related costs;

- changes in the legislative or regulatory environment, including with respect to privacy or data protection, or enforcement by government regulators, including fines, orders or consent decrees;

- fluctuations in currency exchange rates and changes in the proportion of our revenue and expenses denominated in foreign currencies;

- fluctuations in the market values of our portfolio investments and interest rates;

- changes in our effective tax rate;

- announcements by competitors or other third parties of significant new products or acquisitions or entrance into certain markets; our ability to make accurate accounting estimates and appropriately recognize revenue for our solutions for which there are no relevant comparable products;

- changes in accounting standards, policies, guidance, interpretations, or principles; and

- changes in business or macroeconomic conditions.

In addition, the seasonality of our business could create cash flow management risks if we do not adequately anticipate and plan for periods of decreased activity, which could negatively impact our ability to execute on our strategy, which in turn could harm our results of operations. For example, we experience more cash flow generally in the first and third quarters of a fiscal year.

\* \* \*

Our acquisition strategy to date, and going forward, often results in the winding down of the acquired platforms over a period of 12 to 24 months while the existing creators migrate to our platform. The focus often shifts away from these legacy platforms to meeting the needs of migrated creators on our platform. The existence of these legacy platforms within a shifting landscape regarding privacy, data protection and data security may result in regulatory liability or exposure to fines. A significant data incident on a legacy platform may harm our reputation and our brand and may adversely affect the migration of existing

8

creators to our platform. We may also become exposed to potential liabilities and our attention and resources may be diverted as a result of differing privacy regulations pertaining to our applications.

* * *

**_Acquisitions, investments or significant commercial arrangements could result in operating and financial difficulties._**

We have acquired or entered into commercial arrangements with a number of businesses in the past. For example, since 2015 we have acquired seven companies, including ticketscript and Ticketfly in 2017 and Ticketea and Picatic in 2018. Our future growth may depend, in part, on future acquisitions, investments or significant commercial arrangements, any of which could be material to our results of operations and financial condition. Financial and operational risks related to acquisitions, investments and significant commercial arrangements that may have an impact on our business include:

- use of cash resources and incurrence of debt and contingent liabilities in funding acquisitions may limit other potential uses of our cash, including for retirement of outstanding indebtedness, stock repurchases and dividend payments;

- difficulties and expenses in assimilating the operations, products, data, technology, privacy, data protection systems and information security systems, information systems or personnel of the acquired company;

- failure of the acquired company to achieve anticipated benefits, revenue, earnings or cash flows or our failure to retain key employees from an acquired company;

- the assumption of known and unknown risks, debt and liabilities of the acquired company, deficiencies in systems or internal controls, impairment of goodwill or other intangible assets and costs associated with litigation or other claims arising in connection with the acquired company;

- failure to properly and timely integrate acquired companies and their operations, reducing our ability to achieve, among other things, anticipated returns on our acquisitions through cost savings and other synergies;

- adverse market reaction to acquisitions;

- failure to consummate such transactions; and

- other expected and unexpected risks with pursuing acquisitions, including litigation or regulatory exposure, unfavorable accounting treatment, increases in taxes due, a loss of anticipated tax benefits, costs or delays to obtain governmental approvals, diversion of management's attention or other resources from our existing business and other adverse effects on our business, results of operations or financial condition.

When we acquire companies or other businesses, we face the risk that creators of the acquired companies or businesses may not migrate to our platform or may choose to decrease their level of usage of our platform post migration. We have previously experienced customer loss in the process of integrating and migrating acquired companies for a variety of reasons. The pace and success rate of migration may be influenced by many factors, including the pace and quality of product development, our ability to operationally support the migrating creators and our adoption of business practices outside of our platform that matter to the creator.

Moreover, we rely heavily on the representations and warranties and related indemnities provided to us by our acquired targets and their equity holders, including as they relate to creation, ownership and rights in intellectual property, compliance with laws, contractual requirements and the ability of the acquisition target to continue exploiting material intellectual property rights and technology after the acquisition. If any such representations are inaccurate or such warranties are breached, or if we are unable to fully exercise our indemnification rights, we may incur additional liabilities, disruptions to the operations of our business and diversion of our management's attention.

Our failure to address these risks or other problems encountered in connection with past or future acquisitions, investments and significant commercial arrangements could cause us to fail to realize the anticipated benefits of such transactions, incur unanticipated liabilities and harm our business, results of operations and financial condition.

\* \* \*

***If we fail to manage our growth effectively, our business, financial condition and results of operations could be harmed.***

We have experienced, and may continue to experience, rapid growth and organizational change, such as additional controls and procedures and new functional groups within our company, through organic growth or as the result of integrating acquired companies. For example, the number of Eventbrite employees has increased from 609 on June 30, 2017 to 1,016 on June 30, 2018 and we expect to add more employees in the future. This growth and these changes have placed, and may continue to place, significant demands on our management, operational and financial resources. Our organizational structure is becoming more complex as we build the proper level of operational, financial and management controls and develop our reporting systems and procedures. We will require significant expenditures and the allocation of valuable management resources to grow and change in these areas and integrate acquired companies. If we fail to manage our anticipated growth and changes and integrate acquired companies in a manner that preserves rapid innovation, attention to creator satisfaction and overall culture, the quality of our platform and our reputation may suffer, which could negatively affect our ability to retain and attract creators and impact our business, results of operations and financial condition.

\* \* \*

[] ***Selectively Acquire Businesses Focused on Serving Creators.*** We have been successful leveraging our platform to make selective acquisitions that have contributed to creator and revenue growth. We accelerated our momentum through the acquisitions of ticketscript and Ticketfly. By finding like-minded teams who share a common ethos around serving creators, we can continue to expand and offer new capabilities to existing creators. The modularity and extensibility of our platform enables us to quickly integrate and migrate creators to the Eventbrite platform, allowing us to quickly deprecate the acquired technology and associated costs.

48.    The foregoing statements were false and misleading because, unbeknownst to investors or the members of the Class, at the time of the Offering, the migration of creators from Ticketfly to Eventbrite was progressing more slowly than stated, forcing the Ticketfly integration to take longer than expected, and as a result, the Company would face headwinds in revenue and growth.

49.     Furthermore, because this case involves a registration statement, Defendants also had an independent, affirmative duty to provide adequate disclosures about adverse conditions, risks, and uncertainties. *See* Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii). Thus, Defendants had an affirmative duty to ensure that the Registration Statement and the materials incorporated therein disclosed material trends and uncertainties that they knew, or should have reasonably expected, would have a materially adverse impact on the Company's business. Defendants failed to fulfill this obligation as well.

## II.     THE TRUTH BEGINS TO EMERGE

50.     Unfortunately for investors, it was not until approximately March 7, 2019, after the Offering, that they first began to learn the truth concerning Eventbrite, which was not accurately disclosed in the Offering Documents. On that date, the Company announced a fourth quarter loss of $0.17 per share, which was well below analysts' estimates of a loss of $0.13 per share, and issued guidance for the first quarter of 2019 to range between $80 million and $84 million, well below estimates of $91.3 million.

51.     The poor results were due, in large part, to slower than anticipated migration of Ticketfly creators.

52.     The Company held an earnings call on March 7, 2019, to discuss the revised guidance. On that call, Defendant Hartz discussed the headwinds facing the Company because of the slower than expected migration timeline. Defendant Befumo made similar revelations, stating:

> On the first front, how has Ticketfly impacted our growth rate and what have we seen relative to our expectations? As Julia mentioned in the prepared remarks, it's the largest acquisition we've done to date. And what we've learned along the way is that serving creators in this migration context takes time. It takes a deliberate approach because your odds of maintaining the creator and their trust are heightened if you are migrating along a time line that makes sense for their business. And so we certainly, relative to where we were talking over the summer of last year, have taken longer than we planned. But we believe we're doing the right thing by both the creator and in service to the long-term business.

53.     On this news, Eventbrite's stock fell over 24% to close at $24.46 per share.

54.     On May 1, 2019, the Company announced a first quarter loss of $0.13 per share, which was well below analysts' estimates of a loss of $0.08 per share, and revenue of $81.3 million, well below analysts' consensus of $83.1 million. The Company issued guidance for the second quarter of 2019 to range between $74 million and $78 million, well below estimates of $82.4 million.

55.     This poor result was again due, in large part, to slower than anticipated migration of Ticketfly creators.  The Company also announced that Defendant Befumo, its CFO, would move into the role of Chief Strategy Officer.

56.     The Company held an earnings call on May 1, 2019, to discuss the revised guidance.  On that call, Defendant Hartz elaborated on the issues facing the Company because of the slower than expected migration timeline, stating, in part: "We took on a substantial challenge when we acquired Ticketfly and spent time and resources to address the product demand and competitive landscape. This resulted in a complex and consuming integration process. Internally, resources dedicated to Ticketfly has been primarily focused on integrating existing revenues as opposed to delivering net new growth."

57.     On this news, Eventbrite's stock declined over 27% to close at $17.60 per share.

58.     On May 30, 2019, the Company's stock closed at $15.83, or over 31% below the Offering price of $23.00 per share.

## III.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Eventbrite common stock pursuant or traceable to the Offering and Offering Documents and were damaged thereby (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have, or had, a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class.  The members of the proposed Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

63.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts, as alleged herein;

(b)    whether the Prospectus and Registration Statement contained materially false and misleading statements and omissions; and

(c)    to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

64.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**FIRST CLAIM**
**Violations of §11 of the Securities Act**
**Against All Defendants**

65.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants.

67.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

68.    The Company is the issuer of the securities purchased by Plaintiff and the Class.  As such, the Company is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

69.    The Individual Defendants each signed the Registration Statement.  As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of

the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement and to ensure that they were true and accurate, there were no omissions of material facts that would make the Registration Statement misleading, and the document contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

70.    The Underwriter Defendants each served as underwriters in connection with the Offering. As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. These Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that the Registration Statement was true and accurate, there were no omissions of material facts that would make the Registration Statement misleading, and the document contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

71.    By reasons of the conduct herein alleged, each Defendant violated §11 of the Securities Act.

72.    Plaintiff acquired the Company's common stock pursuant or traceable to the Registration Statement and without knowledge of the untruths and/or omissions alleged herein. Plaintiff sustained damages, and the price of the Company's common stock declined substantially due to material misstatements in the Registration Statement.

73.     This claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

74.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11 as measured by the provisions of §11(e) from the Defendants and each of them, jointly and severally.

**SECOND CLAIM**
**Violations of §15 of the Securities Act**
**Against the Individual Defendants**

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.

77.     The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants, individually and collectively, invested in, had the power to influence, and exercised the same over the Company to cause it to engage in the conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.

78.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action and certifying Plaintiff as Class Representative;

B.     Awarding Plaintiff and the other members of the Class compensatory damages;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

D.      Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  June 3, 2019                        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 /s/ John T. Jasnoch
John T. Jasnoch (CA 281605)
600 W. Broadway, Suite 330
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

– and –

Thomas L. Laughlin, IV (*pro hac vice* forthcoming)
Rhiana Swartz (*pro hac vice* forthcoming)
Jonathan Zimmerman (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
tlaughlin@scott-scott.com
rswartz@scott-scott.com
jzimmerman@scott-scott.com

*Counsel for Plaintiff Charles Robinson*